Case number 11-1780, Hawthorne Race Course, Inc. v. Illinois Racing Board, at Long. And I should ask that each person identify themselves, please. My name is Richard Prendergast, may it please the Court. I represent Hawthorne, the appellant in this case. I noticed you mentioned that you have a number of complex cases today, and I think this might at face value look like one of them, but frankly I think that Arlington and IRB in this case have attempted to make this into a somewhat more complicated case than it actually is. It's a straightforward case of statutory construction, and we're not talking about a particularly complex statute. In addition to that, the Court and the parties have the benefit of a well-reasoned opinion of this Court authored by Judge Karnesis in Arlington Park Race Course v. Illinois Racing Board that analyzed and construed the predecessor statute, Section 54b-2b of the Racing Act, enacted in 2006. That statute lapsed two years later in accordance with its sunset provision. A few months after it lapsed, the statute at issue in this case was enacted. That was Public Act 95-1008. As Justice Karnesis wrote in the Arlington case, the language of the two statutes is essentially the same, and, quote, our analysis applies equally to Section 54.75 of the 2008 statute that is issued here. Now, I want to focus on the word analysis. The analysis is the same. The language is the same. The outcome is somewhat different. And I think that's your biggest hurdle because, as often happens, both sides rely on the same case. And we need to know why it doesn't control the outcome here. That's why I'm here. I hope we covered it pretty well in our reply brief, particularly because the reply brief analyzed the statutes in the context of this Court's opinion. And I think that the resolution of this case is very well informed by that opinion. Which leads me to the first myth advanced by the appellees in this case, that Hawthorne does not accept the Arlington decision and is trying to run away from it. Quite the opposite, Your Honor. Arlington lost that case. And largely on the basis of the analysis and statutory construction in the Arlington opinion, they should lose this one as well. The Arlington Court construed the language of Section 54B2B of the 2008 to the extent that Arlington lost that case, the other party won that case, and the other party is now with Arlington on the same side. You know, it's a very well-made point, because in both instances, of course, the IRB wants its position upheld. And unfortunately for the IRB, the position of the 2006 statute, followed a hearing, and the argument here follows a construction of this court, of what happened in that case. And some of the language in that opinion is particularly telling with respect to a number of matters which I hope to touch on this morning. The Arlington Court construed 54B2 of the 2006 statute, which is also, again, found in the 2008 statute. The opinion recognized that 40% of the newly created Horse Race Equity Trust Fund was, quote, intended for improvement, maintenance, and marketing of racing facilities, and therefore should be distributed for the specific purpose of those who had operating control of the racetracks. As you know, 11% of that 40% went to Fairmont Park. Fairmont Park is located due west of here on the Mississippi River and is not involved in this case at all, other than that its 11% is taken out of that 40%. So the remaining 89% of the 40% was to be divided among the remaining eligible recipients. Not all horse racing organizations, but just those that had operating control over racetracks, because only those organizations were in a position to ensure that the Equity Trust Fund monies would be used for improvement, maintenance, and marketing of racing facilities. So this court needed to determine who the General Assembly had in mind in terms of the eligible recipients. Now, Your Honor, this is one of those places where we start to get to that point you just raised. In 2006, the legislature knew that Arlington, Hawthorne, Maywood, Balmoral, and National Jockey Club had each had operating control of a racetrack in 2002 and that each of these entities was duly licensed when the statute was enacted. So they knew who was in front of them. Those were the operators. So as the IRB concluded, and as everyone else seems to agree, including this court in the Arlington case, those two criteria, ownership of the track or operating control over a track in 2002 and a valid license in 2006, became the benchmarks for who would be an eligible recipient for money under the fund. But isn't that the issue? You're saying both those qualifications had to be met, but I think the other side is arguing that just the first one is what makes you eligible, having the 2002 ownership and the licensee in the current year, not 2006, the year that it was enacted, but the year that the money is actually distributed makes you eligible or ineligible. Right. Well, it takes away your eligibility if you're not a licensee in the year that the money is distributed. Right. And while you're a little ahead of me, let me go right to that point. I told you this was a case of statutory construction. There is an absolute provision in the Act, in the section, that addresses, they call it point two, the second of the three criteria, the first criteria being you held a license, that you had operating control over a racetrack in 2002, and the other has to do with operating control of the licensee in the current year. They are not asking you, Your Honor, to statutorily construe that provision. They are asking you to write it out of the bill, out of the Act. They are asking you to absolutely ignore it. It is meaningless. The statute is clear. It defines those persons who are eligible recipients. It's clear that that language is there, and it's clear that they can't live with it. And the reason they can't live with it is touched on in this Court's opinion in the other case. Although NJC wasn't really an issue in that case, it says, and the Court said, as discussed previously, NJC is an example of an eligible licensee that became ineligible. All right? Then it says, NJC was eligible for distribution in 2006 when the legislation was passed, but by the time distribution in 2009, the current year, it had lost its license. It was no longer eligible. Clearly, the Court focused not only on the fact that NJC had operating control over race track in 2002, it specifically focused on the fact that it was eligible for distribution in 2006 when that statute was enacted. And the reason for that is because you've got to identify what the legislature was looking at. The legislature at that point was looking at a viable entity in 2006 that could potentially be a recipient of funds, and that entity, among others, was National Jockey Club. And so, clearly, National Jockey Club was anticipated, but they also anticipated something else. They anticipated the possibility of an eligible recipient becoming ineligible before distribution was made. And so they put the provision in the statute, which you're all familiar with, that says if that happens, then the share of that recipient, that potential recipient, who will not receive it, will be shared pro rata among the remaining distributees. That is the only instance in the Act in which that pro rata distribution is called for. And this Court recognized that in the previous decision because, you recall, in the previous decision the issue was what should happen with suburban and associates? What should happen with the handle generated by those two racing organizations that had never had operating control over a race track in 2002 or at any time? But if they didn't have it in 2002, they were absolutely not eligible. Exactly. Exactly right. They were not eligible. So they could not become ineligible. And, therefore, the Court had to... They were never eligible. They were never eligible. So they couldn't later become ineligible. And so what this Court said was we have to look to what the IRB did in that instance. And what the IRB did in that instance was to recognize what I mentioned earlier, the purpose of the statute was to basically generate funds for the improvement of race track facilities. And so they said the provision that would call for a pro rata distribution of that money, which is what Arlington wanted, does not apply because they didn't become ineligible. So what does apply? And they used the IRB's construction and said the money that was... the share that would have been generated... that was generated by the suburban handle would go to Hawthorne. And the portion that was generated by associates handle would go to Maywood Bell Morrill. Arlington fought that. This Court addressed that. And, basically, the holding in that case is this. If you were never eligible, then the money goes where you ran. If you were eligible and became ineligible, the money is distributed pro rata among the remaining eligible recipients. That's why I say it's not that complicated of a case. It's laid out in the statute. But, more importantly, it's laid out by this Court in its opinion in the Arlington case. So what do we have here? National Jockey Club in 2006 was eligible. There's no question about it. They were eligible because they held a license and they were eligible because they operated racetrack in 2002. In 2008, the identical language is used, but it's the application of the law to that language that's at operation here because I've now set up the mechanism that they were dealing with. In that case, National Jockey Club was not eligible when that statute was passed. They were out of business. Let me interrupt you just very quickly so I can get it straight. What you're saying is that, I think what you're saying is that, Arlington Park took the position you're taking now, Hawthorne is taking now, in the previous decision, but it lost because there was no license to be held in 2002, which means that neither requirement could be met. But here, the first requirement was met, and it's only the second requirement that determines how those other funds would be distributed? Just a little bit of a refinement. I don't think that was Arlington's position entirely, and I'll tell you why. All Arlington wanted to establish in the first appeal was that associates and suburban were never eligible. They wanted a pro-rata share. They wanted a pro-rata share. And they said, admittedly, they were never eligible because they never ran a racetrack in 2002 or any other time, but it should still be distributed pro-rata. And what the IRB held, and what this court held, and, frankly, what the circuit court held, was that, no, that mechanism by which it goes pro-rata is applicable only if you were first eligible. Well, only if the parties were in equal position, that is, each held the license in 2002. You can't distribute among unequal partners. Right. Yes, Your Honor. In that case, there was no question, as there is no question here, that National Jockey Club operated a track in 2002, and associates and suburban did not. Right. So they clearly did not satisfy the requirement for the pro-rata distribution. The point here is that in 2000- Pro-rata only occurs among those who actually had a license. Had a license at the time of enactment- In 2002. It ran a track in 2002, and criteria number two were licensed in the current year. Well, and that's your position in criteria number two, is that they had to be licensed in the year of the enactment of the statute, as opposed to they had to have a license in the year of the distribution. Well, that's our position, but it's drawn from a different premise. The premise is, at some point, it had to be eligible to become ineligible. National Jockey Club was clearly eligible under the 2006 statute. It satisfied- And that's what I'm saying. That's your position. Yes. It seems that the appellee's position is different, that the only qualification is that you had to have the license in 2002. And then when the-at the time that the money is distributed, if you are a licensee then, then you get the money. If you are not a licensee then, then- Then they say- Then it goes- Pro- Then it would go prorated. Yes, it should go prorated. But the premise, the condition for using the prorated provision, is very clearly recognized by this Court in the earlier opinion. You must first be eligible before you become ineligible. There is no question that National Jockey Club, in 2008, was never eligible at any time because they were in bankruptcy, they didn't have a license, they were out of business. They didn't exist. And one of the things in terms of determining legislative intent here is, to adopt their position, the Court would have to conclude that the General Assembly intended, as one of the eligible recipients, a company that at the time the statute was enacted didn't exist. That's necessary. The practical-what's the practical outcome here regarding the NJC? He lost their money for- Are you saying that they were going to get money? They are going to get money? They were only going to get a prorated share, but if you ruled the way you want, you'd get- Basically, that's what I'm asking. What's the difference between the two readings of this statute, in terms of how money is distributed? Our position is, and the Court's position in the Arlington case was, that if you are once eligible- No, but in practical terms. You're asking for a share- In practical terms, we're saying simply this. If you were never eligible, and therefore did not become eligible, you are just like suburban and associates was under the 2000- I understand that part. But I'm saying you want monies that you're not getting. Where is that money? Where are those monies going? He doesn't want to-I think you don't want a prorated share. You want it all because they ran on your track. Exactly. And with this Court held- And instead, they're doing prorated. They want to do prorated. That's exactly right. And the consistent-if you want to-there's an old expression, consistency is the hobgoblin of small minds. But it isn't in the law. Consistency is important in the law. And this Court made that very clear in its original opinion and said, you've got to be consistent in how you're going to construe these statutes. The 2008 statute had obviously been adopted by that, in existence by that. If you had a license and you became ineligible, if you later became ineligible, then the prorated distribution mechanism applies. However, if you were never an eligible licensee, and of course RJC was out of business and nonexistent, if you were never an eligible licensee at any time, so I use the time of enactment, I don't care if it was a year later if you became an eligible licensee, but they never became an eligible licensee, then they were never entitled to any share of this fund. Under those circumstances, you look at what happened to Associates and Suburban in the previous opinion and you say-you give their money, the money that represents their share, their handle, their handle creating a certain share of the fund. You look at that percentage and you apply that-you look at that percentage and whatever money that would generate goes to the track where they ran. And the reason? Because the whole purpose of giving 40 percent to the tracks and 60 percent to the horsemen of the equity trust fund, the whole purpose of giving that 40 percent to the tracks was to improve the backstretch, the tracks, the marketing, the facilities for those tracks. So if the horses ran at Maywood or if the horses ran at Hawthorne, the money goes where the horses ran. That's what the IRB held in the 2006 statute. That's what this court held in the previous decision, and that's what this court should hold here. In this case, in 2004-2005, National Jockey Club ran their races at Hawthorne, nowhere else. And because they ran their races at Hawthorne and because the money is to be used for track maintenance and improvement, that's where the money should go. The only exception to that is if a recipient who is an eligible recipient during the period that the statute is in existence becomes ineligible, then there's a prorated distribution because the statute has a provision for that. But otherwise, that's not what happens. And if it was any other way, this court would not have decided the last appeal in the same way with respect to associates and suburban. They would have said it all goes prorated, which is what Arlington wanted. But they didn't get it. They shouldn't get it here for the same reason. They were this NJC in the 2008 statute. Unlike the 2006 statute, it was never eligible. Therefore, it could not become ineligible. They were never eligible just like associates and suburban were never eligible. The money goes to the track where they ran. That's our case. Thank you very much. I don't know if I've been able to reserve any time because I used up that 20 minutes. We'll have a couple of minutes, sir. Thank you. And counsel, if you both identify yourselves, you can divide your 20 minutes up either way you'd like. That's what we just wanted to clarify, Your Honor. Sean Wood on behalf of Arlington. We're not going to sing a duet right now, but we did want to clarify that we'd split the time between us. And I'm Richard Hosek, Assistant Attorney General, representing the Racing Board and its members, and we've agreed that Sean will go first on behalf of Arlington, and then I'll take the second half of the time. All right. Thank you, gentlemen. Thank you very much, and thank you for the opportunity to present today. Answering a question that was presented a few different ways, the reason that I'm here on behalf of Arlington is that it does have a very specific practical effect. Well, over a million dollars would suddenly go from a situation where there's a statutory scheme that has the same language, with the same identical language, with the only difference being that this equity trust fund created in 2006 was extended. The sunset provision was extended for three more years, didn't create a new fund. It simply extended it for that period of time. And Hawthorne is arguing that that reenactment that resulted in the three-year extension of the identical language should suddenly command a drastically different result. Well, I don't know if that's fair, but let me ask you this. Regarding the Arlington Park, regarding the decision involving your track, it doesn't really control the outcome here. You acknowledge that, right? It does not. It does not. It is a far narrower question that we're asked to address here. I'm even glad you used the word narrow, because what you see if you trace through from the position papers that me and Rich Prendergast submitted back in 2009, the arguments that were being made that he was making then prior to the July 2009 date, and I'll get to that subject matter jurisdiction issue in a minute, but the argument they were making is that you base it on race track. And that decision … And there is certainly logic to that, isn't there? If the purpose of the act was to enhance the race track experience, and they're going to do that by giving money to the race track owners, then all those individuals will share equally. But when it's not involving a race track owner, it is involving another entity that runs at a race track owned by someone equal to, maybe not as well known as Arlington Park, but that those entities, when they were going to receive money, and they don't for consequences outside of race track itself, that those funds that were meant to improve the race track experience at that race track should go to the race track where they ran. And isn't there a certain logic to that? Well, but what we're doing here is statutory construction. Right. And I'm glad you bring up the race track argument, because that was the drum they were beating back then, and the board kept coming back time and time again to say, we have this provision. We have the National Jockey Club provision, as it's called, the 2002 date. Then we have the final sentence of B2B in both iterations of the statute. And that does not say you hand it over to the race track. It says you distribute it pro rata. So the only provision in this statute that addresses what you do with the handle of an ineligible licensee very specifically could have said you give it to a race track and doesn't. And really, that is the deciding, dispositive question. When does pro rata apply? And I think your – and you may suggest that it's clear in the statute, but there's certainly room for disagreement. But there's no room for – Tell me why pro rata applies in this situation based on the language of the statute. There's no room for disagreement that there is nothing in the statute that says that anyone can take 100% of another licensee's handle and just credit to themselves and keep it. That's an entirely opposite of what the statute says. We also know that when they – Well, how does the statute say it? Based on those two provisions regarding holding a license in 2002 and then being eligible at the time of distribution? Well, that answers the question that if it says 2002 and it continues to say 2002, that's the National Jockey Club provision. And you understand that Sportsman's Park closed prior to 2006, in between 2002 and 2006. So the reason that the Illinois legislature was placing that 2002 start date, as Judge Arnold called it, into this statute was because of the desire that National Jockey Club should be able to contend for a distribution in their own right. National Jockey Club, therefore, will never be like Suburban Downs or Associates. The narrow question in the case that Arlington filed that went forward was based on that. What the board said, and this is very important, when we look to the written decision of the board, they started under page 2, issue 1, who is eligible to receive money from the fund. The first sentence says, the language in the statute is clear, only certain organization licensees, not racetracks, are eligible to receive money from the fund. Then they go on to analyze this global argument. In other words, the general argument that it's based on a racetrack. They rejected it, applying principles of statutory construction. Then they got, and if we want to go through it, I mean it says very clearly, the statute does not state that the splits are determined based on the aggregate total of 0405 handled from all organization licensees that operated at a racetrack. Then they framed the next issue as, very narrowly, what to do with Suburban Downs and Associates. And they contrasted it because both iterations of the statute, and by the way, this was the dialogue that was part of that July 2009 hearing. It was argued, 2008 was argued. We argued about 2008. And during that dialogue between Sherman, Sinopoli, and Hawthorne's Council, they explained that wrong, because the 2008 act continues to have that 2002 date. Everybody familiar with the industry knows what that date means. It is the National Jockey Club date. So when you read that provision, and when the final sentence of B2B talks about the persons referred to above, which has to include National Jockey Club, they said not Suburban Downs and Associates. They felt it was silent as to that. But clearly it contains the National Jockey Club provision in both iterations of the statute. And then we look to the final sentence of B2B, the only provision which discusses what to do with the handle of ineligible licensees. And what that says is, you distribute a pro rata to everyone. They don't just get to keep the money. And this racetrack argument they've been peddling for three years was rejected then and it should still be rejected now. Nothing changes it with respect to the decision in the Arlington case because it was a narrow issue presented. And we'd even point out that in that case, as you can imagine, everybody was arguing deference to the board against Arlington and talking about how the board knows best. The board interprets the Illinois Racing Act on a regular basis. The board knows what they're talking about. And when it comes to this National Jockey Club question, they were stating it in very specific terms that everyone on that board and everyone in that room when we argued the issue knew that the 2002 date referred to National Jockey Club. When they talked about Suburban Downs and Associates, and we want to reiterate that the board wasn't hedging on this. When Arlington filed its appeal about Suburban Downs and Associates, we pointed out the fact that Commissioner Acasciato admitted, look, I don't think we're on very solid footing here under the statute when it comes to Suburban Downs and Associates. Chairman Sinopoli said, I can't figure out what to do with Suburban Downs and Associates. Even the first district goes through the language and says it is clear and the board admits that the board's interpretation of the phrase has no direct support in the language of the statute and concludes it is impossible to glean from the instruction how exactly the prorated distribution, the proportion of each eligible licensee's share is to be determined. And then it fell back on deferring to the board's wisdom regarding the issue. When it comes to National Jockey Club, the board didn't equivocate like they did with Suburban Downs and Associates. They were absolutely clear and they used the word crystal clear. In fact, Chairman Sinopoli said to Hawthorne's counsel, NJC, it is the only thing that is crystal clear. The only thing that I can say I understand in this statute is that NJC's money was going to be redistributed to everybody. Now the supposition that that suddenly was intended to change, when we all agree that the legislative history says that the only purpose of the 2008 Act was to extend the sunset provision for three years, nothing else. Hawthorne now is arguing, different from what it argued then, that despite the same language, the same statutory structure, the same 2002 date, that same National Jockey Club provision in the 2008 Act, and the same final sentence which says you distribute it pro rata to everybody, that ignore the man behind the curtain and really we get to keep all the cash. It should suddenly be this windfall in 2008. That doesn't make any sense. And they try to say that it's based on track wear and tear back in 2004 and 2005. Let's think about that for a moment. That would mean that, I think what I heard was, in 2006 and 2007, closer in time and proximity to the time that National Jockey Club ran that meet, that the legislature said, no, no, no, National Jockey Club money gets spread out among everybody. But in 2008, a few years later, long after National Jockey Club wasn't running at Hawthorne, long after those racing dates had been redistributed both between Arlington and Hawthorne, that suddenly what the legislature really intended was for a windfall of cash to flow Hawthorne's way to the detriment of Arlington, Maywood, and Balmoral, the remaining folks in the industry. I don't think that makes any logical sense. I don't think that's a reasonable construction of the statutory language, and I don't think anyone can defensively say that the legislature could possibly have intended that type of result. The other point we wanted to point out, in terms of that middle paragraph of B2B that talks about what you're supposed to do with the money, let me ask you one question. Sure. Would you agree that the statute does have some ambiguities? I think it takes a long time to get through, so for anyone to say that there's anything straightforward about this, it would be incorrect. I think it takes a lot of time to parse and sort through. I think if anyone wishes to take the time to review the briefing that we submitted in connection with the other case, we thought it was one of the first times we saw somebody beat their head against the wall and throw up their hands and say, it's impossible to understand what this means. We don't find any support for it in the statute, but we're going to let the Racing Board do what they want with Suburban Downs and Associates. We think that what happened was a mistake in that regard. So yes, I think that this is a challenging statute to get through, and I do think that there are ambiguities in certain aspects of it. But with NJC, I think at the end of the day, we have a clear provision that is known as the National Jockey Club provision. They can't deny that. They've never been able to explain they couldn't in July 2009, and they can't today that that date is in there. Plainly evidence is the idea that NJC was supposed to contend for a distribution. At some point under the current year, meaning year of distribution, they became ineligible, and therefore we look to the final sentence of B-2-B. I don't want to run out of time on two quick points. One is that in that middle paragraph of B-2-B that talks about what you do with the money, it's not limited strictly to track wear and tear. It talks about marketing. It talks about general operations. It is a very broad provision. So anyone suggesting that this is all tied to fixing up the track, I don't think that the evidence would show that's what Hawthorne did with the money, and I certainly don't think it was limited in that regard. So I don't think that's consistent, and I don't think a legislative intent argument can be made in that regard when we can all see the legislative intent was simply to extend it for three years under the identical fund. The final point, and this is kind of in reverse order as I expect it to go, we did raise the issue of subject matter jurisdiction. We do think it is a threshold issue. It is undisputed that Hawthorne did not file an appeal within 35 days of the July 14, 2009, decision of the Illinois Racing Board. Hawthorne attempted to argue that subsequent distributions of the actual money in accordance with the decision that was rendered previously by the Illinois Racing Board should constitute a new and separately appealable decision. Both the board and Arlington moved to dismiss that argument and the underlying proceedings on the basis that an appeal was not filed within 35 days of the July 2009 decision. When it was first raised by Hawthorne, Chairman Sinopoli immediately wrote Hawthorne and said, we already decided this 10 months ago. It was rejected. The quote is in our papers in terms of the exact quote from the Illinois Racing Board, but I don't think there's any dispute that they responded, this was already decided and you didn't appeal the issue. We understand that Hawthorne is arguing today that because the actual monies that were certified in July 2009 were the monies that had been deposited into the Equity Trust Fund under the 2006 Act, that therefore that would restart the period in connection with monies distributed under the 2008 Act. And the distinction we think is important here is that there are other cases, and we've cited them, the Rosper case, the Karfs case, the Sola case, which all dealt as repentance benefit cases. And there was a decision that interpreted the statute first and foremost, and then after that, distributions were made on an ongoing basis based on the statutory construction decision that had been made. And we believe those cases are analogous here because if you read the transcript, if you look at the decision by the Illinois Racing Board where they cite the 2008 Act four times in the decision, I don't think there's any dispute that we all sat in that room believing and knowing that the decision as to statutory construction was being made on July 14, 2009 in accordance with the written opinion and on a date when the 2008 Act had already been in effect for a year, that we all understood that that decision was going to control for all future distributions. And Hawthorne either made many of the same arguments they were making today, which they didn't appeal the decision within 35 days, or this idea that there's a distinction between 06 and 08 wasn't made at that time, and we believe that argument is untimely, especially when what the board did is actually a very helpful thing. They handed out the decision ahead of time, allowed us to comment on it, and we argued based on the board basically saying, here's the staff memorandum, here's what we're going to be ruling, I think. Tell us how you disagree with it. We all knew what was being decided. It was the 2008 Act decided throughout, and we believe the claim is, barred, as untimely. Any other questions we may answer? Thank you, counsel. Thank you. Counsel, will you do me a favor in your presentation if you would? I noticed that you didn't raise the jurisdictional argument, so I'm just wondering what your position is. Yes. If it may please the court, again, Richard Huzzack, Assistant Attorney General representing the board. Our position is that we have no position on the subject matter jurisdiction of the circuit court. We have taken the position that this court has appellate jurisdiction to review the circuit court's decision, including every issue that's properly raised. But we are not taking a position in this court on the circuit court's subject matter jurisdiction for administrative review. Refresh. Inform me, I assume the issue was raised before the circuit court, and the circuit court said they did have jurisdiction. Yes. Why did she not adopt what? I think the reasoning was, and again, I want to stay neutral on this issue and just describe the circuit court's reasoning. That's the best person to give us this. Yes. But in candor, the board did argue in the circuit court that the circuit court lacked subject matter jurisdiction. That is not the board's position before this court. The board has no position on that issue before this court. But the circuit court, I believe, concluded that the application of the 2006 Act distributions could have changed based upon future events, and it was not possible then for the determination made by the board with respect to those distributions to govern future distributions under the 2008 Act when one of the licensees could have gone out of business or something else could have changed. It was a future bundle of facts or set of circumstances that couldn't have been preordained or decided in that case. Nonetheless, we think that there are dramatic similarities between the two statutes, the meaning of the two statutes, and the application of the two statutes, as I would like to address on the merits of the issue before the court here. Briefly by way of introduction, my distinguished opposing counsel for Hawthorne has indicated that this is a straightforward matter of statutory interpretation, but I would like to urge the court to view this dispute as one where the board has consistently maintained the same straightforward interpretation of the statute under both Acts, drawing a distinction between the right to receive a distribution and the application of what we've called the redistribution clause, the criterion for that, or I think the court has sometimes referred to it as the pro rata provision, where the criteria that you have to satisfy before you can become ineligible to receive a distribution under the redistribution clause are not identical to the criteria under which you have a right to receive a distribution under the preceding subparagraphs, depending upon whether you're Fairmount, subparagraph A, or the other five entities that were locked and frozen in terms of a permanent identification of who might receive a distribution. The board's position has been consistent, and I wanted to point out that Hawthorne's position has been inconsistent. They argued first that there had to be an identity between those two provisions, that the redistribution clause was applicable or could apply only for somebody who met all of the criteria in the preceding paragraph entitling them to receive a distribution. And with their position before the board at the July 14, 2009 hearing being current year for that provision meant year of distribution. Then in their letter to the board with respect to the 2008 Act, and in their opening brief in this court, they said, no, no, no, the board must have met and said that the right to receive a distribution under the prior provision means the year of enactment, not the year of distribution. And here they appear to have again departed from even that second position and are now saying, well, the two may not be equivalent. You don't have to see whether you satisfy all of the criterion for the one provision to be someone to whom the pro rata provision can apply. There's this new criterion, which is you had to be entitled to receive a distribution at least when the statute was enacted before the pro rata provision can apply. Now, they don't point to anything in the statute that says that. They allude to nonexistent legislative history because the legislative history goes the opposite way. But they have now shifted position three times. The board's position has been consistent. That the statute doesn't say these are the criteria for being a person who can become ineligible and those criteria are the right to receive a distribution. The statute says a person identified in this paragraph two who becomes ineligible. Well, the only way you can become ineligible, everybody agrees, is by not having a license at the time of distribution. And so the only sensible interpretation of that phrase, a person identified in this paragraph two, is somebody who meets the fixed criteria but doesn't have a license in the current year because you can't have it both ways. Current year meaning year of distribution. Year of distribution. And I don't think there's any dispute that that provision of the statute, which this court adjudicated in the prior litigation, Arlington versus the Racing Board, current year has been adopted. It's the one that makes sense from the policy perspective. We don't want distributions actually going into the hands of persons who would otherwise might receive a distribution but aren't in operation. So current year means current year. And you can't have it both ways. You can't say that the criteria you have to satisfy before you can become ineligible and thus not receive a distribution are the same criteria that mean that you have to receive a distribution. This was pointed out at the July 14th hearing, and Hawthorne has never come to grips squarely with this proposition. They finally, in their reply brief, try to sort of retreat and say, well, current year can mean current year for the subparagraph A or B, but then if you lose the license during that year, then you don't get the distribution. But this is playing jimmy rigging the statute to change the language that the legislature used to try and reach a result. We've got all sorts of legal theories in search of a single outcome, but none of those legal theories are grounded in the text of the statute or the legislative history, and they're inconsistent with this court's prior ruling. I want to emphasize one key point here, which relates to the fact that the Hawthorne position is not grounded in the text of the statute but departs from the text of the statute in multiple ways. But the most significant way is they use the word eligible repeatedly to describe the right to receive a distribution. Well, there's a semantic ambiguity there that they seize upon. They're treating eligible in the sense not of just being among the group that could get a distribution if you meet additional criteria. They're using eligible in the sense of you've already met all those criteria and so you get a distribution. And I think the best comparison is in the lottery statute and regulations where they say you're eligible to win a prize only if you're 18 years old and not an employee of the lottery board. Well, I walk in and I say, I meet those eligibility criteria, give me the prize. And they say, no, no, no, wait, you're confused. Eligibility doesn't mean winning the prize. Eligibility doesn't mean you get the money. Eligibility, the board has said, although that's not the phrase used in the statute, a person identified in this paragraph 2, the board said, means meeting the fixed criteria in the statute, which if you also have a license in the current year, then you have the right to receive a distribution. Let me ask you a question. Isn't Hawthorne's position a very fair position? No, it really isn't because they're saying that the years in which the – well, first it's not fair because the meaning of the statute, I think, on this point is unambiguous. There's no reasonable interpretation pursuant to which you can do what they do and read the redistribution clause out of the statute, which is what they're reading would do. But in addition, the years that are used to determine the shares of the various National Jockey Club and Hawthorne were sharing operating control under a joint venture of Hawthorne's track. So Hawthorne wasn't the exclusive operator and contributor to those expenses. And when the 2008 Act was reenacted, if National Jockey Club was out of business, why does it make any sense to give Hawthorne the entire share of National Jockey Club's handle equivalent, if you will, when it's no longer running any races under an arrangement with National Jockey Club? NJC was no longer running any races when the 2008 Act was passed at Hawthorne's track. And they're saying, yes, but give us the share that they would have received based upon the races that they previously ran under the prior period of time, 2004, 2005. So even the fairness argument, I don't think, gets them anywhere. Those points being made, I'd like to just answer some of the questions that were or follow up on some of the questions that the court raised from other counselors earlier in this. The statute nowhere says that a criterion for receiving a distribution or that you have to satisfy before you can become ineligible to receive a distribution is having a license in the year of enactment of the statute. Now, I understand that in the court's prior decision, there is reference to the fact that National Jockey Club did have a license in 2006 when that statute was passed. And I think Hawthorne seizes upon that because the rest of the decision entirely undermines its argument before this court and says, aha, the court held that you had to have a license in the year of enactment, otherwise you couldn't become ineligible. But that was supposed to be the year of distribution. Well, it was supposed to be, but I think the reasoning of the court and my observation about its significance focuses on a slightly different point, which is the court wasn't saying that to establish some new requirement in the statute that nowhere appears in it in order to render the Pro Rata Clause applicable. It was simply saying that National Jockey Club had previously been eligible to receive a distribution, and it lost that eligibility, and it chose, as an example of the point in time of prior eligibility, 2006. So in sort of the language of logic, that was a sufficient condition to trigger application of the redistribution clause. But the court never said it was a necessary condition that being a licensee in the year of enactment is a necessary condition for application of the redistribution clause under the 2006 Act or the 2008 Act. And, of course, the statute never says that it's a necessary condition for application of the redistribution clause. And we were never asked to decide that question. It was more descriptive than anything. I believe it was, although as part of the court's ultimate decision, it did specifically affirm the board's ruling. Hawthorne didn't appeal. And to the extent collateral estoppel applies, it applies to the board's decision to the extent it wasn't overruled, even on points that this court didn't specifically address and decide. And that would include the fundamental aspects of the board's ruling in the prior decision that negate the position that Hawthorne has taken until finally it appears in its reply brief where, without any other place to stand, they retreat to the notion that there's some new thing that should be read into the statute that doesn't appear anywhere that's now the new criterion before which the pro rata clause can apply. Their argument is circular in the beginning because it renders the redistribution clause a nullity, contrary to the canon of statutory interpretation. You're not supposed to do that, whereas the board preserves its application. I'm going to ask you to kind of sum up. Just in answer to a couple of the questions that the court observed, the difference in this case is not whether National Jockey Club gets any money or doesn't. Everybody agrees that it will never get any of the money that's in dispute in this case. The question is simply whether it goes to Hawthorne as Hawthorne wants or instead it's distributed among the four, all four, Hawthorne and the other three parties that operated a racing track in 2002 and had a license in the year of distribution. I think the other point that Arlington's counsel mentioned and I want to reaffirm is, with respect to any question of statutory interpretation regarding the re-enactment or the re-sunsetting of the 2006 Act to this 2008 Act, it's critical that the legislature, saying we essentially want to do this the same way we did before, and Hawthorne said it's going to apply in the same way, although they've now departed from that position, they used again the 2002 year. Hawthorne's reply brief doesn't address the significance of that because they can't. The only reason that the 2008 Act continued to use the 2002 year was, as everybody agrees, that was to ensure that National Jockey Club would remain within the entities who were, I'll use the board's phrase, among those to whom a distribution could have been made if any of those people also had a license in the current year. That's the only possible purpose for doing that. Now, the practical effect of doing that may not have been because National Jockey Club was out of business to intend to have a distribution go to it, but it clearly shows that the allocation among the other players who still had licenses was going to be the same and that the redistribution clause was going to continue to apply in the same fashion that it did. Unless the court has any additional questions, we urge the court to affirm the board's decision. If the court concludes that there is any ambiguity, we urge the court to defer to the board's position and to affirm the circuit court and the board's ruling in this case. Thank you, counsel. Mr. Prendergast, you have a couple of minutes, counsel. Your Honor, I ask the court to defer to the appellate court's decision because the court, in that case, has already construed the 206 statute. The state of the two statutes should be treated equally or interpreted in the same fashion. With respect to the jurisdictional question, that is, in my judgment, clearly the most specious argument that's been advanced in this case. It's based upon the notion that the hearing in 2009 actually adjudicated both statutes. It did not. The minutes of the Illinois Racing Board on July 24 specifically stated that the board certifies the amounts and percentages for the distribution of the horse racing equity trust fund as generated by the enactment of House Bill 1918. That's the 2006 statute. Item 4 of the board minutes identifies, quote, the request submitted by staff to calculate the distribution of the monies of the horse racing trust fund, section 54.5 of the Horse Racing Act of 1975. That's the 2006 statute. The staff recommendation on distribution of the equity trust fund dated July 8, 2009, authored by the IRB's general counsel, specifically provides that HB 1918 was signed into law on May 26, 2006, and goes on to discuss that provision. I won't read it in full, except that she says HB 1918 money is money paid pursuant to the 2006 statute. The reported proceedings specifically refers to the funds generated under House Bill 1918. That's the 2006 statute. And even to make it clearer, that memo states, quote, the certification only includes funds generated by way of the enactment of House Bill 1918. I won't go into it any further, but we certainly covered it in our brief. There is no issue here about filing a notice of appeal following the 2009 hearing. The 2009 hearing adjudicated the 2006 statute. I don't think there could be any doubt about that. The attorney general says that in the current year, the current year is a requirement for the redistribution clause, and not whether you are eligible, in fact, in the first instance, to receive a distribution. I don't understand that. There's only one provision. It's an issue. And that issue, that distribution is section B2B. And it says that the remaining 89 percent shall be distributed pro rata, et cetera, et cetera, to any person or its successors who, one, had a major operating control of a racing facility for live racing conducted in 2002, and is a licensee in the current year. Now, that's the only thing we're construing here. In the papers filed in the circuit court, or, no, in the staff memo that relates to this case, the language of the statute is clear. Only certain organizational licensees, not racetracks, are eligible to receive money from the fund. To be eligible for a split of the fund, two conditions must be met. A person must have had majority operating control of a racing facility in 2002 and must be an organizational licensee in the current year. What they are asking you to do, and they're very explicit about it, I think maybe the word should be bold about it, is they don't want you to construe that statute. They want you to write it out of the bill. Write it out of the law. Put a line through it. It doesn't exist. But that's not what they were saying in earlier instances during these proceedings. That's not what they were saying in the circuit court. This is made up out of whole cloth argument because unless they do that, they cannot deal with the eligible become ineligible problem. The only time that redistribution provision kicks in is when you're first eligible and you become ineligible. And undoubtedly the national was not at any time during the 2008 statute beginning and middle, I don't care where you put it, a licensee and therefore could not have been eligible under the very language of the statute. Counsel, I'm going to have to stop. Okay. Thank you very much for your time. Thank you very much. I thank both sides. And we will certainly take the case under consideration.